# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

JACQUELINE CAVALIER NELSON, et al.,

Plaintiff,

v.

AVON PRODUCTS, INC., et al.,

Defendants.

Case No. 13-cv-02276-BLF

**ORDER GRANTING PLAINTFFS' MOTION FOR CLASS CERTIFICATION**

[Re: ECF 56]

This purported class action involves a dispute over alleged employment misclassification. The named Plaintiffs are former District Sales Managers of Defendant Avon Products, Inc. The Plaintiffs allege that Avon improperly misclassified DSMs as exempt from overtime wages. Plaintiffs move the Court to certify a class of "all persons employed by Defendant in California as District Sales Managers from April 8, 2009 to the present," as well as to appoint Plaintiffs' counsel, Blumenthal, Nordrehaug & Bhowmik, as class counsel, and to designate the named Plaintiffs as class representatives. For the reasons below, the Court GRANTS Plaintiffs' motion.

## I. BACKGROUND

### A. The Job Duties and Major Responsibilities of Avon DSMs

The nineteen named Plaintiffs were employed as District Sales Managers ("DSMs") by Avon in California between April 8, 2009 and the present. DSMs were classified by Avon as exempt from overtime wages during this time period. Martin Depo., Bhowmik Decl., ECF 56-2 at 103:18-23. DSMs are responsible for recruiting Representatives to sell Avon products. *See, e.g.*, *id.* at 134:11-137:19.[1] Several named Plaintiffs in this case testify that this recruiting, called

---

[1] Avon sells consumer goods, including skin care products and household items. Its business model relies on nearly six million "Avon Representatives" who are responsible for selling these

"prospecting" in Avon corporate parlance, was a DSM's primary job responsibility. *See* Bandini Depo., Bhowmik Decl., ECF 56-2 Exh. 10 at 107:20-110:12 (describing meeting with and recruiting prospective Representatives to be her "primary task" as a DSM); Colon Decl., Bhowmik Decl., ECF 56-9 at ¶ 4 ("My main responsibility as a District Sales Manager for Avon was to recruit independent contractor Sales Representatives in and around my assigned district."); Bilitch Depo., Bhowmik Decl. ECF 56-2 Exh. 6 at 116:4-14 (testifying that she was instructed to "go out and prospect with my reps, get my reps involved, teach them how to prospect and spend my time prospecting"); Flores Decl., ECF 56-10 at ¶ 4 ("Defendant's company policy required me and other District Sales Managers to spend at least eight (8) hours each day in the 'field' recruiting independent contractor Sales Representatives."). DSMs would also train their Representatives to do their own prospecting, in addition to providing some training in general sales skills. *See, e.g.*, Campbell. Depo., Bhowmik Decl., ECF 56-2 Exh. 13 at 93:23-94:24 ("What I did for training was I would teach [the Representatives] how to sell, but that was very, very minimal because most of what Avon wanted us to do was to recruit them and teach them how to recruit."). DSMs do not themselves sell Avon products. *See, e.g.*, Martin Depo. at 38:21-23.

Avon provides its DSMs with materials to assist in prospecting and training Representatives, including promotional materials, product samples, recruiting tents, and other props. *See* Martin Depo. at 121:1-122:3. DSMs testify that they would set up these tents, which could be quite heavy, around their assigned districts when attempting to recruit new Representatives. *See, e.g.*, Branson Decl. ¶ 9 ("I had to set up the recruiting tent multiple times during my employment in the parking lots of local businesses . . . in order to recruit Sales Representatives. The tent was so big I had to ask random strangers to help me set it up.").

DSMs also testify that they are subject to substantial supervision. Division Managers, to whom DSMs report, can access a DSM's work calendar and schedules. *See* Cabrera Depo. at 32:1-33:24 (testifying that she was able to review her DSM's work schedules and calendars); Gaskell Depo., Bhowmik Decl., ECF 56-2 Exh. 8 at 13:20-14:1 (testifying that she could review DSM

---

and other Avon products directly to consumers. These Representatives are independent contractors. *See* Martin Depo. at 10:11-25, 38:24-39:2.

work calendars). An Avon employee further testified in the company's 30(b)(6) deposition that Division Managers supervised DSMs in a manner such that they were able to know "where, geographically, [a DSM] might be in the district." Martin Depo. at 62:2-12. District managers also ride along with their DSMs while the DSMs are prospecting in order to directly supervise their work. *See* Gordon Depo., Bhowmik Decl., ECF 56-2 Exh. 9 at 54:24-55:2. DSMs are also monitored by their Division Managers with regard to Avon's Key Performance Indicators ("KPIs"), which includes, among other data, the number of Representatives a DSM recruits and the sales those Representatives makes. *See* Martin Depo. at 30:9-23, 37:15-24; *see also* Gaskell Depo. at 21:8-22:5. At least one Division Manager testified that she reviewed her DSMs' KPI reports on a daily basis. *See* Cabrera Depo. at 35:20-37:22, 40:15-23.

Finally, the named Plaintiffs contend that DSMs are far removed from the general business operations of Avon's business, because they exercise no control over Avon's operating or managerial policies since their main job was to recruit "anyone with a pulse" as a Representative. *See, e.g.*, Bishop Decl., ECF 56-7 at ¶¶ 3-4 ("I could not hire, fire, discipline, or promote any Avon employees . . . Avon would allow me to accept anyone with a pulse."); Branson Decl. ¶ 3 ("I possessed zero authority to make any employment-related, personnel decisions.").

Avon's own documents support the named Plaintiffs' testimony that the main role of DSMs is to recruit new Representatives. Avon's "DSM Roles & Responsibilities" document outlines that DSMs have six primary areas of responsibility, the first two being "training and developing 1st generation representatives/top sellers (through coaching and mentoring)" and "appointing, training, and developing new sales leaders." *See* "Direct Sales Manager Role & Responsibilities," Bhowmik Decl., ECF 56-2 Exh. 4 at 1, 3. Avon again describes the importance of prospecting new Representatives in a training presentation entitled "US Sales Training & Development," ECF 56-2 Exh. 3 at 8, which says that "Direct Sales Managers are the key to achieving direct selling excellence through outstanding recruiting, motivating, and training of Avon Representatives." This document further states that "Direct Sales Manager and Representative's (sic) roles are clearly defined," *id.* at 9, and identifies four tasks in which DSMs are expected to engage: (1) planning, (2) recruiting Representatives, (3) training and developing

Representatives, and (4) measuring performance and reporting results. *See id.* at 12. Avon identifies the "fundamental expectations" of DSMs with regard to these four tasks to include "prospect[ing], recruit[ing], and appoint[ing] Representatives," "maintain[ing] high levels of Representative coverage," "enthusiastically promot[ing] and manag[ing] the New Representative Development Process," and "improv[ing] Representative retention." *Id.* at 14-18.

After this lawsuit was filed, Avon commissioned a study by Dr. Christina Banks which was designed to "determine what tasks and activities DSMs actually perform on the job." *See* Banks Decl., ECF 61 at ¶ 3.[2] The study observed thirty DSMs over the course of a day, and Dr. Banks identified 153 discreet tasks that DSMs perform, grouped into nineteen "Task Areas":

1. Planning Recruiting Activities
2. Promoting Avon and Recruiting Representatives
3. Growing the Representative Base Through Others
4. Educating Representatives on Building their Sales and Recruiting Skills
5. Demonstrating Sales and Recruiting Activities to Representatives
6. Coaching and Mentoring Representatives in Marketing and Sales
7. Coaching and Mentoring Representatives in Recruiting
8. Facilitating Representatives' Orders and Customer Service
9. Developing and Implementing Strategies for Growing Revenue
10. Reviewing and Analyzing District Performance
11. Business Planning and Scheduling
12. Updating Product Knowledge and Sales Skills
13. Managing District Budget
14. On-boarding New Representatives
15. Selling Products and Performing Sales Support Activities
16. Maintaining and Securing Facilities and Equipment
17. Performing Clerical Activities
18. Managerial Drive Time
19. Non-Managerial Drive Time

Banks Decl. at p. 17, Table 4.

Dr. Banks noted in short that "DSMs serve as the interface between the company and the

---

[2] Plaintiffs object to, and move to strike, the Banks Declaration on two grounds: (1) that Dr. Banks was not disclosed to Plaintiffs and (2) that her Declaration contains improper legal conclusions. *See* Reply, ECF 67 at 15. For the reasons stated on the record at the February 19, 2015 hearing, the objection is **overruled** and the motion to strike is **denied**. The Court will disregard any improper legal conclusions contained within the Banks Declaration.

independent sales representatives, the people who sell Avon's products directly to consumers." *Id.* at ¶ 5. Though the study found that all DSMs engaged in these nineteen Task Areas, it found variations among the DSMs regarding the amount of time each spent undertaking certain tasks. For example, the least amount of time spent by an observed DSM engaging in "updating product knowledge and sales skills," Task Area 11, was no time at all, while the most time spent by an observed DSM undertaking tasks in this Task Area was 5 hours and 37 minutes. *See id.* at ¶ 34.

At oral argument on the motion, Plaintiffs' counsel did not disagree with the Task Areas identified by the Banks Study's Task Areas as comprising the activities in which DSMs engaged:

> The Court: In your reply brief you seemed to be willing, at least for purposes of this motion, to accept the 19 tasks identified by Ms. Banks. Did I read that correctly?
>
> Mr. Bhowmik: Absolutely.
>
> The Court: Okay. But I presume at trial you would have your own list of tasks and you are not adopting those for all purposes.
>
> Mr. Bhowmik: I would have to look at them a little more closely. I think the point is *I agree that's what the people do*.

February 19 Hearing Transcript at 28:21-29:5 (emphasis added).

### B. The Legal Claims

Plaintiffs contend that they have been denied overtime pay in violation of California Labor Code §§ 510, 1194, and 1198. California law provides that the Industrial Welfare Commission ("IWC") may establish exemptions from the requirement that employees be paid overtime compensation. *See* Cal. Labor Code § 515. The IWC has promulgated, through California Wage Order 4-2001 (hereinafter "Wage Order 4"), three exceptions to the general rule that employees must be compensated for overtime, for "executive," "administrative," and "professional" employees. See Wage Order 4 §§ 1(A)(1)—(3). In this case, Avon contends that DSMs fall within the administrative exemption of Wage Order 4, and are thus not entitled to overtime.

Wage Order 4 outlines a five-part test to determine whether an employee falls within the administrative exemption:

> The employee must (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers, (2) "customarily and regularly

5

> exercise[] discretion and independent judgment," (3) "perform[] under only general supervision work along specialized or technical lines requiring special training" or "execute [] under only general supervision special assignments and tasks," (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage.

*See, e.g.*, *Eicher v. Adv. Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1371 (2007) (citing Wage Order 4 § 1(A)(2)).

Critically, Avon bears the burden of proof with regard to whether the DSMs are properly classified as exempt from the provisions of Wage Order 4. *See, e.g.*, *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 794-95 (1999) ("[T]he assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption.") (citing *Nordquist v. McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555, 562 (1995)). Further, Wage Order 4's requirements are stated in the conjunctive: if only one of the requirements for the administrative exemption is lacking, the administrative exemption is inapplicable to the employee. *See Eicher* at 1372 (2007) ("Stated in the conjunctive, each of the five elements must be satisfied to find the employee exempt as an administrative employee.").

The parties dispute whether the Court can determine if DSMs were properly classified as exempt on a class-wide basis. Because Defendant bears the burden of proof with regard to the administrative exemption, Plaintiffs proffer four questions of law or fact that they contend can be adjudicated on a classwide basis, each of which they contend would render all DSMs misclassified under the law: (1) whether DSMs' duties and responsibilities involve the performance of non-manual work; (2) whether DSMs' duties and responsibilities involve work directly related to management policies or general business operations; (3) whether DSMs customarily and regularly exercise discretion and independent judgement; and (4) whether DSMs work under only general supervision.

Plaintiffs contend that these four questions predominate over any individual inquiries, because if they prevail as to any of these four questions they would show that the administrative exemption is inapplicable to Avon's California DSMs. Defendant argues in response that while DSMs might have the same job description, the manner in which they actually perform their jobs varies too widely for the Court to be able to determine whether DSMs as a class were exempt, and

1  that such questions must instead be adjudicated individually.

## II. LEGAL STANDARD

Recognizing that "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," Federal Rule of Civil Procedure 23 demands that two requirements be met before a court certifies a class. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

A party must first meet the requirements of Rule 23(a), which demands that the party "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Behrend* at 1432. If a party meets Rule 23(a)'s requirements, the proposed class must also satisfy at least one of the requirements of Rule 23(b). Here, Plaintiffs invoke Rule 23(b)(3), which demands that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry inherent in a Rule 23(b)(3) analysis asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," focusing on "the relationship between common and individual issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (further noting that the express purpose of Rule 23(b)(3) was to "achieve economies of time, effort, and expense and promote [] uniformity of decision as to persons similarly situated"). Rule 23 outlines four pertinent factors to the Court's analysis in determining the appropriateness of a (b)(3) class: the class members' interest in individually controlling the action; the extent and nature of already-existing litigation regarding the action; the desirability (or lack thereof) of concentrating the litigation of the claims in a single forum; and manageability of the action. *See* Fed. R. Civ. P. 23(b)(3); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

The party seeking class certification bears the burden of showing affirmative compliance with Rule 23. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). A court's analysis of class certification "may entail some overlap with the merits of the plaintiff's underlying claim[s]," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194

1  (2013), though the merits can be considered only to the extent they are "relevant to determining
2  whether the Rule 23 prerequisites to class certification are satisfied." *Id.* at 1195. Within Rule 23's
3  framework, the district court maintains broad discretion over whether to certify a class or subclass.
4  *See, e.g.*, *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

### III. DISCUSSION

Plaintiffs seek to certify a class of "all persons employed by Defendant in California as District Sales Managers from April 8, 2009 to the present." *See* Mot. at 1. Class certification requires the Court to engage in a two-step analysis. First, it must determine whether the four requirements of Rule 23(a) have been established: (1) numerosity, (2) common questions of law or fact, (3) typicality, and (4) adequate representation." *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 974 (9th Cir. 2011). Second, Plaintiffs must satisfy at least one of Rule 23(b)'s provisions. *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011). When a party invokes Rule 23(b)(3), as Plaintiffs do here, the Court is tasked with deciding whether "the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon* at 1022. "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," a court may certify a class pursuant to Rule 23(b)(3). *See id.*

The Court turns first to the four requirements of Rule 23(a). Defendant argues that Plaintiffs cannot meet the Rule's commonality or typicality requirements. For the reasons discussed below, the Court disagrees.

#### A. Rule 23(a)

##### 1. Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." Courts have repeatedly held that classes comprised of "more than forty" members presumptively satisfy the numerosity requirement. *See, e.g.*, *DuFour v. BE LLC*, 291 F.R.D. 413, 417 (N.D. Cal. 2013).

Defendant does not dispute that the class is sufficiently numerous, and stated in its Notice

8

of Removal that it employed 187 employees as DSMs in California between April 8, 2009 and May 17, 2013. *See* Notice of Removal, ECF 1 at ¶ 31. The Court finds that the proposed class satisfies Rule 23(a)(1).

### 2. Commonality

Rule 23(a)(2) demands that "there are questions of law or fact common to the class." The Supreme Court has stated that the mere raising of common questions by plaintiffs is insufficient for purposes of class certification, and instead that the "common contention [] must be of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009) ("What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (emphasis in original)).

Plaintiffs proffer four possible common questions that they contend are capable of classwide resolution: (1) whether DSMs' duties and responsibilities involve the performance of non-manual work; (2) whether DSMs' duties and responsibilities involve work directly related to management policies or general business operations; (3) whether DSMs customarily and regularly exercise discretion and independent judgement; and (4) whether DSMs work under only general supervision. In response, Defendant conflates these common inquiries into a single common question – "that Defendant's polic[ies] improperly treat[] all employees alike for exemption purposes" – and argues that this is the type of "literal common question[] that the Supreme Court [has] rejected as being insufficient" to show commonality under Rule 23(b)(2). *See* Opp. at 15 (citing *Dukes*, 131 S. Ct. at 2550-51). Defendant argues that Plaintiffs cannot simply rely on a uniform classification policy in order to show commonality. *See id.* Instead, Defendant contends, individualized inquiries are necessary for the Court to determine how each DSM spends his or her time. The Court considers each of Plaintiffs' proposed common questions in order to determine whether they are capable of generating the "common answers" necessary to find commonality.

The first common question identified by Plaintiffs, whether DSMs' duties and responsibilities involve the performance of non-manual work, is by far the least susceptible to

9

generating a classwide resolution. Defendant points to wide discrepancies in the testimony of named class member DSMs in terms of how much manual labor they perform. *See, e.g.*, Nielson Depo., ECF 60-5 at 105:5-107:4 (describing spending twenty hours per week on manual labor tasks, including loading and unloading boxes from her car); Espinoza Depo. ECF 60-6 at 105:3-108:19 (describing an office-based work environment in which he spent most of the day contacting his independent Representatives, with no discussion of manual labor tasks). Defendant further points to declarations from non-plaintiff DSMs in which they describe performing varying degrees of manual labor. *See* Guerrios Decl., ECF 60-13 at ¶ 9 ("The physical tasks associated with [recruiting] activities are not a major production and are a minimal, insignificant part of my job."); *see also* Montalvo Decl. ¶ 10 ("[W]hen I was a DSM, I spent only about 20 to 30 minutes in a day performing physical tasks.").

Plaintiffs argue that Avon's corporate policy demanding DSMs be able to lift 35 pounds, as well as the fact that Avon provides DSMs with an eighty pound tent for campaign events, is evidence that the class as a whole engages in manual labor. This argument is unpersuasive, however, because the evidence presented to the Court by both parties shows that individualized inquiries are necessary to determine whether the "primary duty" of each individual DSM was the performance of office or non-manual work. *See Rincon v. AFSCME*, 2013 WL 4389460, at *17 (N.D. Cal. Aug. 13, 2013) (finding that "fieldwork is not necessarily manual work" for purposes of a union organizer who engaged in substantial out-of-office organizing activities). As the Court in *Rincon* noted, "an exempt employee can perform some manual work without losing exempt status." *Id.* (citing *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 401 (6th Cir. 2004)). Plaintiffs' proposed common question is not susceptible to classwide resolution due to the wide disparity in testimony from named Plaintiffs and other DSMs with regard to how much of their work is manual labor, and the need for the Court to individually determine whether each DSM was primarily involved in manual labor rather than office work.

Plaintiffs' second through fourth questions, however, fare better in the commonality inquiry. Plaintiffs' second question, whether the DSMs' duties and responsibilities involve work "directly related to management policies or general business operations," can be determined by

10

examining the tasks in which DSMs engage, and does not rise or fall depending on how much time each DSM spends engaged in those activities. Defendant's own argument supports a finding of commonality with regard to this question: Defendant does not argue that some DSMs engage in work directly related to management policies while others do not, but rather that "DSMs satisfy this requirement because they independently manage their own mini-Avon business and perform promotional work through recruiting, training and motivating reps." *See* Opp. at 20. Both parties thus offer a single class-wide argument on the merits of the "directly related" prong. The argument between the parties boils down to whether the types of tasks in which DSMs engage are directly related to management policies, in contrast to the "non-manual work" element, which would force individualized inquiries as to the amount of time spent on those tasks. Plaintiffs are correct that "[t]he trier of fact can determine if the nineteen (19) finite tasks identified by Defendant are exempt or non-exempt tasks" for purposes of the "directly related" element of the administrative exemption, and therefore this question is sufficient to meet Rule 23(a)(2)'s commonality prong. *See* Reply, ECF 67 at 2.

Though "even a single common question will do" for purposes of Rule 23(a)(2), *see Dukes* at 2556, the Court notes that the remaining two questions identified by Plaintiffs are also sufficiently common to justify class certification. The third question, whether DSMs customarily and regularly exercise discretion and independent judgment, is susceptible to common proof because of the theory on which Plaintiffs rely. Plaintiffs contend that because Avon Representatives are independent contractors, DSMs are precluded by California law from exercising direct control over them. Defendant responds by arguing that "DSMs use their judgment in a variety of ways including, but not limited to, calendar planning and management, training and coaching [Representatives], resolving issues they encounter in the field, and developing strategies to improve sales." Opp. at 22. Defendant's argument is similar to the one it offered with regard to the "directly related" prong: that DSMs necessarily exercise discretion based on their job responsibilities. This question is therefore also susceptible to class-wide resolution.

Similarly, Plaintiffs' fourth proposed common question, whether DSMs work under

general supervision, relies on proof common to the class. Plaintiffs point to two policies put in place by Avon with regard to all DSMs: both a minimum, baseline supervision policy, and that Avon permits its Division Managers – who supervise DSMs – to impose more supervision over DSMs as desired. *See* Reply at 7-8. This supervision includes a uniform attendance policy, access to each DSM's daily calendar, and the monitoring of a DSM's performance goals. *See id.* at 4-5. Defendant argues in contrast that DSMs are subject to "infrequent direct supervision and are not required to have their calendars approved by their supervisor," and contends that the Court will need to make individual inquiries as to whether each DSM was subject to general supervision. *See* Opp. at 21.

Though this is a closer call than the "directly related" and "discretion and independent judgment" questions, the Court finds that this fourth proposed question is also subject to common proof. Plaintiffs argue that there is sufficient evidence to show that class members were subject to far more than just "general supervision," including a uniform attendance policy, *see* Bhowmik Decl., ECF 56-2 Exh. 7 (stating that DSMs are to "adhere to their work calendar and to advise their Division Manager of any deviation from that schedule."), Division Managers having the ability to access DSMs' daily calendars, and the capacity of Division Managers to impose additional supervision when key performance indicators ("KPIs") were not being met. Defendant argues that Plaintiffs' declarations show that they were subject to varying degrees of supervision, and thus the Court would need to engage in individualized inquiries, but this argument is unpersuasive: Plaintiffs point to evidence that shows various *additional* forms of supervision which were imposed upon DSMs which, if true, would allow the factfinder to determine that DSMs are subjected to more than just general supervision despite the slight variations in the forms of supervision imposed. *See, e.g.*, Gaskell Depo. at 13:20-14:13 (noting that she, as a Division Manager, has access to her DSMs' calendars and is "able to review their calendars"); Cabrera Depo. at 32:1-33:23; *see also* Martin Depo. at 90:15-18 (stating that Division Managers "hold [DSMs] accountable to []the various, you know, job responsibilities and duties"); Gordon Depo. at 54:24-55:19 (describing riding along with DSMs in order to supervise them in the field).

Though some DSMs may be subject to greater supervision than others, the common

12

1  question here is whether DSMs were subject to more than just general supervision. Defendant
2  points to no persuasive reason why individualized inquiries are required to answer this question,
3  and the Court therefore finds Plaintiffs' fourth question also sufficiently common to the class.

### 3. Typicality

Class representatives must have claims that are "typical of the claims" of the other members of the class, in order to ensure that "the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (citing Rule 23(a)(3)). Typicality is "directed to ensuring that plaintiffs are proper parties to proceed with the suit." *Reis v. Arizona Beverages USA*, 287 F.R.D. 523, 539 (N.D. Cal. 2012). The standard for determining typicality, however, is a permissive one, *see id.*, and asks only whether the claims of the class representatives are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Defendant argues that Plaintiffs' claims are not typical "[b]ecause the evidence demonstrates that the manner in which plaintiffs performed their job duties is dissimilar to the way other DSMs performed them." Opp. at 23. Defendant's argument is unpersuasive, and relies on a conflation of the commonality and typicality inquiries. The named Plaintiffs and absent class members have claims that are "reasonably co-extensive" with one another – slight variations in the manner in which Plaintiffs performed their jobs as DSMs does not render a single named Plaintiffs' claim atypical from the rest of the class. All named Plaintiffs challenge the classification of DSMs as exempt – none seek to advance claims that are divergent from the claims of absent class members. *See Hanlon* at 1020. As such, the named Plaintiffs set forth claims that are typical of the other members of the class.

### 4. Adequacy

The final requirement of Rule 23(a) is that the named Plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry requires the Court to make two determinations: (1) whether the named plaintiffs and class counsel have any conflicts of interest with other class members; and (2) whether counsel and the class

representatives will "vigorously prosecute the action on behalf of the class." *Reis*, 287 F.R.D. 523, 540 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)). The Court has an obligation to "ensure that the litigation is brought by a named Plaintiff who understands and controls the major decisions of the case." *Sanchez v. Wal-Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009).

Defendant does not challenge the adequacy of the named Plaintiffs or of Plaintiffs' counsel, Blumenthal, Nordrehaug & Bhowmik. Plaintiffs offer declarations in which they recognize that their duty as named Plaintiffs is to the interests of the class as a whole, and that they will not put their own individual interests before those of the class. *See, e.g.*, Becerra Decl. ¶¶ 10-11; Bilitch Decl. ¶¶ 10-11. Neither party identifies any possible conflict between the class representatives and any absent class members. Further, Plaintiffs' counsel has outlined the firm's experience in class litigation of this type, and points to several other district courts that have found the firm to be adequate counsel. *See* Mot. at 18; *see also* Blumenthal Decl. Exh. A.

The Court finds that Plaintiffs are adequate class representatives and that Plaintiffs' counsel will vigorously prosecute this action on the class' behalf. Plaintiffs have therefore met Rule 23(a)(4)'s adequacy requirement.

Plaintiffs have made a sufficient showing under all four prongs of Rule 23(a). The Court therefore turns to the requirements of Rule 23(b)(3) to determine if "a class action would achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citing the Advisory Committee Notes on Rule 23, 28 U.S.C. App. at 697).

### B. Rule 23(b)(3)

Rule 23(b)(3) permits a court to certify a class only when two criteria are met: (1) the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See Zinser* at 1189. The party seeking class certification bears the burden of showing that common questions of law or fact

predominate. *See id.* Though these criteria are interrelated, the court must address each independently. *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). Defendant's argument against Rule 23(b)(3) certification focuses on predominance, and the Court begins its inquiry there.

### 1. Predominance

The Ninth Circuit has stated that the "focus of [the predominance factor] is on the relationship between the common and individual issues." *In re Wells Fargo*, 571 F.3d 953, 957. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification" for certifying a class action. *Hanlon* at 1022. The Court must determine whether a "common nucleus of facts and potential legal remedies dominates" the litigation. *Id.*

Defendant's primary argument against predominance is that a determination of liability by the Court requires "individualized inquiries regarding how DSMs actually perform their job duties," an argument similar to the one it made regarding commonality. *See* Opp. at 23-24. Avon argues that Plaintiffs rely too heavily on its uniform exemption policy in support of class certification, while ignoring the individualized inquiries the Court will need to make. *See id.* at 24 ("[T]he evidence overwhelmingly demonstrates that how DSMs perform their job duties, and the time spent on those duties, varies based on numerous factors. . . . On this basis alone, the Court should find that individual issues predominate."). Defendant is correct that the Court cannot rely on Avon's uniform exemption policy "to the near exclusion of other factors relevant to the predominance inquiry." *In re Wells Fargo* at 960. That being said, "[a]n internal exemption policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees." *Id.* at 957, 958-59 ("[U]niform corporate policies will often bear heavily on questions of predominance and superiority."). Thus, the Court looks both the uniform policies identified by Plaintiffs as well as the specific differences between Plaintiffs outlined by Defendant. A review of the evidence proffered by both sides shows that though individual differences exist among the named Plaintiffs and absent class members – as they would in any case in which hundreds of employees engage in the same job – the issues

common to the class members predominate over those differences. *See, e.g.*, Banks Study, at ¶¶ 6-7.[3]

First, the three common questions that the Court found appropriate for class treatment – whether DSMs' duties are directly related to management or business operations, whether DSMs regularly exercise independent judgment, and whether DSMs work only under general supervision – are subject to common proof that relies in no small part on the nature of their duties, not the amount of time in which individual DSMs spend on each task. The Court needs to look no further than Defendant's own arguments and the Banks Study to ascertain that common issues will predominate over individual issues with regard to these three questions. Defendant argues that DSMs' responsibilities are directly related to management policies because "they independently manage their own min-Avon business." Opp. at 21. Nowhere does Avon suggest that some DSMs meet this criterion while others do not – Defendant's argument rests on the idea that *all* DSMs engage in duties related to management policies. This broad characterization severely undercuts Defendant's argument that the Court will need to engage in individual inquiries, let alone that those individual inquiries will predominate over questions common to the class.

Defendant's arguments regarding Plaintiffs' "exercise discretion" and "general supervision" questions are similarly unpersuasive. Defendant argues that DSMs exercise discretion "in a variety of ways including, but not limited to, calendar planning and management, training and coaching [Representatives], resolving issues they encounter in the field, and developing strategies to improve sales." Opp. at 22. These, again, are tasks in which Avon claims all DSMs engage. *See, e.g.*, Banks Study. Defendant's reliance on *Friend v. Hertz Corp.*, a 2011 case from this district, actually undermines Avon's argument here. In *Friend*, the district court noted that the applicability of an exemption to overcome compensation generally requires a fact-specific inquiry as to the way each employee actually spends his or her time, but that plaintiffs can still certify a class when they show "uniformity in work duties and experiences that would

---

[3] The Banks Study characterized certain Task Areas as "exempt" and others as "non-exempt." *See, e.g.*, ECF 61 at ¶¶ 17-18. The Court disregards these legal conclusions, but notes that the Banks Study contends all 30 DSMs observed spent the majority of their time engaged in the same set of Task Areas. *See id.* at ¶ 7.

16

diminish the need for individualized inquiry." *See Friend*, 2011 WL 750741, at *5 (N.D. Cal. Feb. 24, 2011). Defendant has indicated that it intends to rely on the uniformity of DSMs' work duties – the *nature* of the tasks they are expected to perform – in support of its classification of those employees as exempt. *See, e.g.*, Opp. at 20-23. Further, Plaintiffs' legal argument on this question relies on its contention that California law prevents DSMs from exercising control over Representatives because Representatives are independent contractors. This is a legal question that is common to the class as it goes to the general relationship between DSMs and Representatives.

Though the Court has already noted above that there are individual differences among DSMs with regard to whether they work under only general supervision, these differences do not render class treatment inferior to individual actions. This is because Plaintiffs' theory is not dependent on the specific type of supervision one Division Manager imposes on one DSM, but rather on Avon's corporate policies that give Division Managers wide latitude to exercise supervisory control over DSMs, and to impose *additional* supervision as needed. The evidence proffered by Plaintiffs is consistent with this argument, as they point to various ways in which Division Managers control DSMs' calendars or scheduling, engage in ride alongs with their DSMs, or discipline them when they fail to meet their KPIs. Plaintiffs' theory of this prong of the administrative exemption is based on both the minimum and maximum amount of supervision allowed by Avon's company policies.

Though Avon contends that a determination of liability requires individualized inquiries as to the work DSMs perform, a review of the evidence and theories to be offered by both sides to the factfinder shows that the questions common to the class predominate over any of these individual questions. A comparison of Defendant's arguments regarding Plaintiffs' manual labor question, which the Court found inappropriate for class treatment, and the exercise of discretion question, which the Court found appropriate for class treatment, is instructive. Individual issues would predominate the manual labor question because its answer turns on how much manual labor an individual DSM actually performs. In contrast, common issues predominate with regard to the exercise of discretion question because it turns on whether the nature of the tasks in which DSMs engage require independent judgment or discretion. Because the parties *do not dispute* what tasks

DSMs engage in, a factfinder could determine whether, for example, each task outlined in the Banks Study requires a DSM to use his or her discretion. Thus, common questions sit at the heart of this case, and predominate over any individual differences between the Plaintiffs.

### 2. Superiority

In order to certify Plaintiffs' class under 23(b)(3), the court must also find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority inquiry under Rule 23(b)(3) requires a determination of whether the objectives of the particular class action procedure will be achieved in the particular case," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998). The court finds that two facts weigh heavily in favor of class certification.

First, the proposed class includes employees that still work for Avon. These employees may be afraid to bring actions on their own behalf, for fear of retaliation by their employer. Allowing Plaintiffs to proceed in a representative capacity ensures that all class members will receive their day in court without requiring current employees of Avon to risk their employment to receive that right.

Second, if this action were to proceed on an individual basis, it is possible that a judgment in favor of Plaintiffs would bind Avon with respect to other class members by virtue of collateral estoppel, while a judgment in favor of Avon would not bind class members who are not party to the present litigation. For instance, if Plaintiffs were to proceed individually and prove that even the most minimal supervision of DSMs provided for in Avon's company policies constitutes more than "only general supervision," Avon would be bound by this finding in future actions by other class members. This would render Avon vulnerable to suit by every other class member without the benefit of the defense it asserts in the current action. On the other hand, if Avon were to succeed on this point, each class member not party to the present action would still retain the ability to bring suit and re-litigate this issue, since collateral estoppel would not apply with respect to non-parties to this litigation. In other words, allowing a class action in this case will ensure that the finality of judgment in this action is a two-way street, not one that adheres only to the benefit of the Plaintiffs and non-party members of an uncertified class.

These two facts go directly to two of the four factors outlined in Rule 23(b)(3) and *Hanlon* which a court must consider in the superiority inquiry: the interests of class members in individually controlling the action and the desirability of concentrating the litigation in a single forum. The other two factors – the extent of already-existing litigation and manageability of the action – also support certification. First, neither party identifies in their briefing any existing actions regarding DSMs and overtime misclassification in California. Second, the Court is not persuaded by Defendant's argument that this case will devolve into "200 mini-trials," *see* Opp. at 25, because the questions common to the class will serve to streamline the litigation.

## IV. ORDER

For the foregoing reasons, the Court certifies the following class: "[A]ll persons employed by Defendant in California as District Sales Managers from April 8, 2009 to the present." The Court further appoints Blumenthal, Nordrehaug & Bhowmik as class counsel, and approves the designation of named Plaintiffs as representatives of the class.

**IT IS SO ORDERED.**

Dated: April 17, 2015

_____
BETH LABSON FREEMAN
United States District Judge